UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

-against-

BRIAN KOLFAGE,
STEPHEN BANNON,
ANDREW BADOLATO, and
TIMOTHY SHEA,

Defendants.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5/25/2021

20 Cr. 412 (AT)

**MEMORANDUM
AND ORDER**

ANALISA TORRES, District Judge:

Defendant, Stephen Bannon, moves to dismiss the indictment against him pursuant to the pardon issued by President Donald J. Trump on January 19, 2021 (the "Pardon").  Pardon, ECF No. 79; Def. Mot., ECF No. 101.  For the reasons stated below, Bannon's motion is GRANTED.

## BACKGROUND

On August 17, 2020, a grand jury in the Southern District of New York returned an indictment (the "Indictment") against Brian Kolfage, Stephen Bannon, Andrew Badolato, and Timothy Shea (together, "Defendants"), alleging that they conspired to commit the crimes of wire fraud, in violation of 18 U.S.C. § 1349, and money laundering, in violation of 18 U.S.C. § 1956(h).  Indictment, ECF No. 2.

The Indictment sets forth the following allegations.  In December 2018, through a crowdfunding website (the "Crowdfunding Website"), Kolfage initiated an online fundraising campaign that generated more than $20 million.  *Id.* ¶¶ 3–5.  According to webpage statements, the campaign planned to donate the money to the federal government for the construction of a wall along the southern border of the United States.  *Id.* ¶ 3.  Within a month, after questions arose concerning Kolfage's background and the campaign's stated purpose, the Crowdfunding

Website suspended the campaign, warning Kolfage "that unless he identified a legitimate non-profit organization into which those funds could be transferred, the Crowdfunding Website would return the funds." *Id.* ¶¶ 4–5.

Kolfage then involved Bannon and Badolato "in the leadership" of the fundraising efforts. *Id.* ¶ 6. Bannon quickly took "significant control of the campaign's organization and day-to-day activities, including its finances, messaging, donor outreach, and general operations." *Id.* ¶ 7. He oversaw the establishment of a not-for-profit entity, We Build the Wall Inc. ("We Build the Wall"), to receive the money contributed to the online campaign in order to fund a reworked project: the private construction of a wall along the southern border of the United States. *Id.*

To persuade the Crowdfunding Website to release the funds to We Build the Wall, Kolfage, Bannon, and Badolato agreed that donors would have to "opt in" to the rerouting of the money, effectively causing We Build the Wall to "re-raise" the funds by convincing donors to permit the transfer. *Id.* ¶¶ 8–9. Bannon, Kolfage, and Badolato also made a series of representations and assurances to the Crowdfunding Website, including their commitment to put into place "written bylaws with conflict of interest provisions and compensation restrictions precluding insiders like Kolfage, among others, from improperly misappropriating donor funds, and a promise that 'Kolfage will personally not take a penny of compensation from [the] donations.'" *Id.* ¶ 8.

Starting in January 2019, Bannon, Kolfage, and Badolato—in donor solicitations, public statements, social media posts, and press appearances—caused We Build the Wall to "promise donors that '100% of funds raised' would be used toward the construction of a wall, and that not a 'penny' would be used to compensate Kolfage." *Id.* ¶ 11. Bannon, Kolfage, and Badolato also

said that the leadership of We Build the Wall and its advisory board, which Bannon chaired, would not be compensated. *Id.* ¶ 14. Bannon specifically made these statements in his own press appearances, including that "[he] did this kind of as a volunteer" and that We Build the Wall was "a volunteer organization." *Id.* ¶¶ 11, 14. Bannon, Kolfage, and Badolato expected these promises to drive donations, *id.* ¶ 13, and in fact, donors indicated that the messaging successfully influenced them, *id.* ¶ 15.

Unbeknownst to donors, within days of the launch of We Build the Wall, Bannon, Kolfage, and Badolato, among others, agreed that Kolfage would be paid "$100k upfront [and] then 20 [per] month." *Id.* ¶ 17. In one of a variety of ways, Bannon agreed to pass payments from We Build the Wall to Kolfage through a nonprofit Bannon controlled (the "Bannon Entity"). *Id.* ¶ 18. In making this agreement, Bannon made clear that there would be "no deals [he did]n't approve." *Id.*

Pursuant to this secret pact, in February 2019, a month after donors began consenting to the transfer of funds to We Build the Wall, Bannon directed Badolato to wire cash from We Build the Wall to the Bannon Entity. *Id.* ¶ 19. Shortly thereafter, We Build the Wall wired $250,000 to the Bannon Entity. *Id.* Though Kolfage did no work for the Bannon Entity, approximately a week later, it transferred $100,000 to him. *Id.* ¶¶ 18–19. In the following two months, two $20,000 payments—the same amount designated as Kolfage's monthly salary in the secret agreement—were routed to Kolfage using an identical method. *Id.* ¶ 19. To conceal the payments, Kolfage asked that they be made to Kolfage's spouse for "media." *Id.* In total, over $1 million was transferred from We Build the Wall to the Bannon Entity. *Id.* ¶ 24. Bannon, apart from using these funds to pay Kolfage's secret salary, used "a substantial portion . . . for personal uses and expenses unrelated to We Build the Wall." *Id.*

Starting in April 2019, Kolfage's monthly salary, along with other payments, continued to pass to Defendants through other shell companies. *Id.* ¶¶ 21–22. In October 2019, when Defendants learned of a possible criminal investigation, they took additional steps to conceal their scheme, including ceasing payments to Kolfage, using encrypted messaging applications, and editing We Build the Wall's website to remove the promise that Kolfage was not being compensated. *Id.* ¶ 26.

Between January and October 2019, We Build the Wall raised approximately $25 million, consisting of most of the $20 million which donors opted into transferring, and newly donated funds. *Id.* ¶ 16. Some donors had written directly to Kolfage, saying that they did not have a lot of money and were skeptical about online fundraising campaigns, but they were giving what they could because they trusted Kolfage would keep his word about how their money would be spent. *Id.* ¶ 15. By October 2019, Kolfage had received more than $350,000 in donor funds, and Bannon and the other defendants received hundreds of thousands of dollars each, which they used on personal expenses such as travel, hotels, and personal credit card debt. *Id.* ¶¶ 23–24.

On January 19, 2021, President Donald J. Trump granted Bannon a "Full and Unconditional Pardon":

> For offenses charged in the United States District Court for the Southern District of New York in an indictment (Docket No. 20-cr-412) charging violations of Sections 981(a)(1)(C), 1349, 1956(h), and 1957(a), Title 18, and 2461(c), Title 28, United States Code [and for] any other offenses charged under Chapter 95 of Title 18, United States Code that might arise, or be charged, in connection with the offenses alleged in the above-listed indictment . . . in the United States District Court for the Southern District of New York, or any other federal jurisdiction.

Pardon. Bannon accepted the Pardon, Costello Aff. ¶ 5, ECF No. 101-1, and on March 18, 2021, he moved to dismiss the Indictment against him, Def. Mot.

## DISCUSSION

"The President . . . shall have Power to grant Reprieves and Pardons for Offen[s]es against the United States, except in Cases of Impeachment."  U.S. Const. Art. II, § 2, cl. 1.  This power is "granted without limit," *United States v. Klein*, 80 U.S. 128, 147 (1871), and therefore, the "executive can reprieve or pardon all offenses after their commission, either before trial, during trial or after trial, by individuals, or by classes, conditionally or absolutely, and this without modification or regulation by Congress,"  *Ex parte Grossman*, 267 U.S. 87, 120 (1925).  "Once accepted, a full and absolute pardon releases the wrongdoer from punishment."  *United States v. Flynn*, No. 17 Cr. 232, 2020 WL 7230702, at *14 (D.D.C. Dec. 8, 2020) (internal quotation marks and citation omitted).

The Government does not dispute the validity of the Pardon, nor that the Pardon "ends the prosecution as to Bannon under Indictment 20 Cr. 412."  Gov. Mem., ECF No. 106; *see also United States v. Schaffer*, 240 F.3d 35, 37–38 (D.C. Cir. 2001) ("[T]he Presidential pardon ends all litigation."); *W. Watersheds Project v. Bernhardt*, 392 F. Supp. 3d 1225, 1246 (D. Or. 2019) ("[A] pardon removes all legal punishment for the offense.").

However, the Government asks that, instead of dismissing the Indictment, the Court "direct the Clerk of Court to terminate Bannon as a defendant in this case and have the docket sheet reflect the [P]ardon as the disposition of his charges."  Gov. Mem. at 1.

Neither the Government nor Bannon has cited authority binding on this Court as to whether the correct course is to "administratively terminate" Bannon, or to dismiss the Indictment against him.  ECF Nos. 86, 88–89, 102, 106–07.  However, it is not the practice of this district to remove a defendant from the docket without a resolution of the indictment. Moreover, the majority of courts, when faced with such a decision, have chosen to dismiss an

indictment, particularly when a defendant has moved for dismissal.  *See United States v. Zangrillo*, No. 19 Cr. 10080-19 (D. Mass. Feb. 10, 2021), ECF No. 1725; *United States v. Kurson*, No. 20 Mag. 990 (E.D.N.Y. Feb. 4, 2021), ECF No. 6; *United States v. Carter*, No. 20 Cr. 20222 (S.D. Fla. Feb. 1, 2021), ECF No. 23; *Flynn*, 2020 WL 7230702, at *15; *United States v. Arpaio*, No. 16 Cr. 1012 (D. Az. Oct. 4, 2017), ECF No. 247 at 6:19–20; *see also Schaffer*, 240 F.3d at 37–38 (dismissing as moot a case where the defendant was pardoned between the district court's ordering a retrial and convening the new trial).  *But see United States v. Urlacher*, No. 20 Cr. 111-8 (N.D. Ill. Feb. 8, 2021), ECF No. 142 (directing the Clerk of Court to "1) terminate all motions as to Casey Urlacher; and 2) administratively terminate all pending charges against Casey Urlacher as January 19, 2021 pursuant to the Grant of Clemency").  The Court concludes, therefore, that the Pardon is valid, and that dismissal of the Indictment is the proper course.

Of course, "a pardon does not, standing alone, render [a defendant] innocent of the alleged . . . violation." *Schaffer*, 240 F.3d at 38.  Nor does a pardon before conviction "blot out probable cause of guilt or expunge an indictment." *In re North*, 62 F.3d 1434, 1437 (D.C. Cir. 1994).  To the contrary, from the country's earliest days, courts, including the Supreme Court, have acknowledged that even if there is no formal admission of guilt, the issuance of a pardon may "carr[y] an imputation of guilt; acceptance a confession of it." *Burdick v. United States*, 236 U.S. 79, 94 (1915); *see also United States v. Noonan*, 906 F. 2d 952, 958–60 (3d Cir. 1990) (discussing the history of pardons and innocence in the Anglo-American legal system).  For instance, in 1833, Chief Justice John Marshall wrote that, "[a] pardon is an act of grace, proceeding from the power intrusted with the execution of the laws, which exempts the individual on whom it is bestowed, from the punishment the law inflicts for a crime he has

committed." *United States v. Wilson*, 32 U.S. 150, 150 (1833).  Twenty years later, the New

Jersey Supreme Court noted,

> Pardon implies guilt. If there be no guilt, there is no ground for forgiveness.  It is
> an appeal to executive clemency.  It is asked as a matter of favor to the guilty.  It is
> granted not of right but of grace.  A party is acquitted on the ground of innocence;
> he is pardoned through favor.  And upon this very ground it is that the pardoning
> power is never vested in a judge.

*Cook v. Freeholders of Middlesex*, 26 N.J.L. 326, 331–32 (N.J. 1857).  This venerable principle

remains true in the twenty-first century.  *See Schaffer*, 240 F.3d at 38 ("[A]cceptance of a pardon

may imply a confession of guilt."); *Noonan*, 906 F. 2d at 960 ("Poena tolli potest, culpa perennis

erit (The punishment can be removed, but the crime remains)." (citing Black's Law Dictionary

1040 (5th ed. 1979)).

## CONCLUSION

For the reasons stated above, Bannon's motion is GRANTED and the Indictment is

DISMISSED as to him, pursuant to paragraph one of the Pardon.

SO ORDERED.

Dated: May 25, 2021
       New York, New York

_____
       ANALISA TORRES
       United States District Judge